[Cite as *In re J.C.*, 2013-Ohio-3937.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY   COUNTY**

IN RE:                                         :
                                               :          Appellate Case No.   25608
           J.C. and D.P.                       :
                                               :          Trial Court Nos. JC 1998-6524
                                               :                            JC 2010-5852
                                               :
                                               :          (Juvenile Appeal from
                                               :           Common Pleas Court)
                                               :
                                               :
           · · · · · · · · · ·

O P I N I O N

Rendered on the 13th day of September, 2013.

· · · · · · · · · ·

MATHIAS H. HECK, JR., by MATTHEW T. CRAWFORD, Atty. Reg. #0089205, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
           Attorneys for Appellee, MCCS

DAWN S. GARRETT, Atty. Reg. #55565, 70 Birch Alley, Suite 240, Dayton, Ohio 45440
           Attorney for Appellant, H.P.

· · · · · · · · · · · ·

HALL, J.,

{¶ 1}    H.P. (Mother) appeals from the trial court's January 11, 2013 orders awarding

Montgomery County Children Services (MCCS) permanent custody of two of her children, J.C.

and D.P.

{¶ 2} Mother advances three assignments of error in this expedited appeal. First, she contends the trial court discriminated against her based on a disability, in violation of the federal Americans with Disabilities Act (ADA), when it terminated her parental rights without making a reasonable effort to accommodate her disability and without first seeking a planned permanent living arrangement. Second, she claims the trial court erred in finding an award of permanent custody to be in the children's best interest when that disposition was not the only means of obtaining a legally secure placement. Third, she asserts that the evidence does not support an award of permanent custody to MCCS.

{¶ 3} The record reflects that J.C. was born in 1997 and was adjudicated dependent in 1998. Since that time, various parties have had custody of J.C. The trial court first granted legal custody to the maternal grandparents. In 2008, the trial court granted legal custody to Mother. In December 2010, however, the trial court granted temporary custody to the maternal great aunt. In January 2011, the trial court granted MCCS temporary custody of J.C. After multiple extensions of temporary custody, MCCS moved for permanent custody in August 2012.

{¶ 4} D.P., the other child at issue, was born in 2006 and was adjudicated dependent in 2010. MCCS obtained temporary custody. After temporary custody was extended, MCCS moved for permanent custody in August 2012.

{¶ 5} The trial court held a hearing on the two permanent-custody motions in October 2012. Based on the evidence presented, it filed separate January 11, 2013 decisions awarding MCCS permanent custody of J.C. and D.P. This appeal followed.

{¶ 6} In her first assignment of error, Mother contends that she has a disability within the meaning of the ADA and that MCCS violated the ADA by failing to make reasonable efforts

to accommodate her disability through its services and case-plan objectives and by failing to pursue a planned permanent living arrangement rather than permanent custody. This argument lacks merit for at least four reasons.

{¶ 7} First and foremost, an alleged violation of the ADA is not a defense to a permanent-custody motion. "Title II of the ADA prohibits public entities from discriminating based on disability. The procedure for enforcing the ADA begins with the filing of a complaint with a designated agency." (Citations omitted.) *In re C.W., J.W. & H.W.*, 1st Dist. Hamilton No. C-11032, 2011-Ohio-4756, ¶39. "If appropriate, the agency will refer the case to the Department of Justice[,] which may file suit in a federal district court. An alternative procedure is for a private individual to directly initiate an action, with or without waiting for the federal administrative procedure to run its course." (Citations omitted.) *Id.* "Ohio courts have refused to apply the ADA so as to provide a defense to individuals in permanent-custody actions initiated by public children-services agencies." *Id.* at ¶40 (citing cases from the Fourth, Ninth, and Twelfth appellate districts). We join these courts in finding "that an alleged violation of the ADA by a public children-services agency may not be asserted as a defense in a permanent-custody action brought by that agency."[1] *Id.* at ¶41.

{¶ 8} Second, Mother failed to allege a violation of the ADA in the proceedings below. As a result, she has waived all but plain error, which does not exist on the record before us.

---

[1] The only Ohio case law Mother cites supporting the ADA's applicability as a defense to a permanent-custody motion is *In re Burrows*, 4th Dist. Athens No. 95CA1698, 1996 WL 309979 (May 30, 1996). In that case, the Fourth District "assum[ed] without deciding" that the ADA applied. *Id.* at *3. In a more recent case, however, the Fourth District concluded that the ADA did not provide a defense to a permanent-custody motion. *See In re Harmon*, 4th Dist. Scioto No. 00 CA 2693, 2000 WL 1424822, *12 (Sept. 25, 2000) ("We do not believe that a failure to comply with the ADA serves as a basis for invalidating an award of permanent custody. Rather, the ADA appears to contemplate a separate procedure for its enforcement.").

{¶ 9} Third, Mother has not demonstrated that she has a disability within the meaning of the ADA. The legislation provides that the term "disability" means (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. 12102. Here Mother has depression and a mood disorder. She shows evidence of a narcissistic and histrionic personality. She scored in the average to low-average range on various achievement and intelligence tests. She also was found to lack some self awareness and to exercise limited judgment. (Tr. Vol. I at 67-72, 87-88). Whether these limitations establish a "disability" under the ADA is far from clear. Therefore, Mother could not demonstrate plain error even if the ADA did provide a potential defense to a permanent-custody motion.

{¶ 10} Fourth, assuming arguendo that Mother's limitations do qualify as a disability under the ADA, the record reveals that MCCS made reasonable efforts to accommodate her. MCCS developed a case plan and repeatedly worked with Mother to satisfy it. Among other things, the agency referred her numerous times for parenting classes, psychological evaluations, and counseling. Despite regular assistance, Mother largely failed to follow through and did not come close to satisfying her case plan. On appeal, she argues broadly that MCCS did not attempt to accommodate her. She fails to articulate, however, what accommodations should have been provided or how they would have made a difference. The only thing she mentions is the agency's failure to seek a planned permanent living arrangement. But MCCS had no legal obligation to seek a planned permanent living arrangement before moving for permanent custody. *See*, *e.g.*, *In re D.J.*, 12th Dist. Butler No. CA2008-06-142, 2008-Ohio-5424, ¶12; *In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359, 852 N.E.2d 1187, ¶34-36. For the foregoing reasons, Mother's first

assignment of error is overruled.

{¶ 11} In her second assignment of error, Mother claims the trial court erred in finding an award of permanent custody to be in the children's best interest when that disposition was not the only means of obtaining a legally secure placement. In her third assignment of error, Mother asserts that the evidence does not support an award of permanent custody to MCCS. Because these assignments of error are similar, we will consider them together.

{¶ 12} This court recently set forth the standards governing permanent-custody determinations as follows:

> R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. * * *

> R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the

wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

*In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶14-15.

**{¶ 13}** Here the trial court made the findings required to award MCCS permanent custody. With regard to both children, the trial court found, by clear and convincing evidence, that they could not be placed with either parent within a reasonable time and that an award of permanent custody was in the children's best interest. We see no error in these determinations, which enjoy ample evidentiary support.

**{¶ 14}** As a threshold matter, we note that neither child's father has challenged the trial court's permanent-custody determination. The trial court found that J.C.'s father was unknown and that the location of D.P's father, who has a pending warrant for his arrest on a rape charge, was unknown. With regard to Mother, the record reflects that the children most recently were removed from her care in 2010 due to a lack of supervision, a lack of food, and poor home conditions. (Tr. Vol. II at 12-13). The lack of supervision involved D.P. and another sibling, J.P., wandering around the neighborhood naked and dirty. (*Id*. at 8). MCCS developed a case plan to address its concerns. As amended, the plan included requirements for Mother to obtain suitable housing and income, to complete parenting and anger-management classes, to undergo

psychological and mental-health assessments, and to follow through with visitation and all other recommendations. (*Id*. at 16). The agency went over the case plan with Mother monthly to review her objectives and what she needed to do. (*Id*. at 15). Despite those efforts, Mother did not come close to meeting her objectives.

{¶ 15} At the time of the permanent-custody hearing, Mother was homeless and residing in a temporary shelter that could not accommodate children. (*Id*. at 17, 22). Prior to that arrangement, she had spent time in at least two other shelters. (*Id*. at 20-21). When the case plan was drafted in 2010, Mother had no income. (*Id*. at 22). She still lacked any income at the time of the October 2012 permanent-custody hearing. (*Id*. at 22, 25). Although Mother did participate in some classes and assessments, she failed to follow through with all requirements. Specifically, she completed only six of eleven sessions of a parenting class. (*Id*. at 29). She also failed to complete anger-management classes and failed to complete required mental-health counseling. (*Id*. at 31-33, 35-37). With regard to visitation, Mother had attended only a small number of the scheduled weekly sessions between January 1, 2012, and the October 2012 hearing. (*Id*. at 51). Her last visit before the hearing took place on May 23, 2012. (*Id.*). A clinical psychologist who examined Mother opined that "she was going to have a lot of significant difficulty in being able to parent her children consistently on a day-to-day basis." (Tr. Vol. I at 87).

{¶ 16} The evidence before us clearly and convincingly supports a finding that J.C. and D.P. cannot be placed with either parent within a reasonable time because "[f]ollowing the placement of the [children] outside the [children's] home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the [children] to be placed outside the home, the parent has failed continuously

and repeatedly to substantially remedy the conditions causing the [children] to be placed outside the [children's] home." R.C. 2151.414(E)(1).

{¶ 17}  The record also supports the trial court's finding that an award of permanent custody is in the children's best interest. Perhaps the most significant factor is the children's interaction with Mother and others. The record reflects that D.P. is well bonded with his long-term foster parents, who desire to adopt him. (Tr. Vol. I at 153). D.P. is receiving treatment for his special behavioral, emotional, and educational needs and is making good progress. (*Id.* at 136-145). The record contains evidence that neither J.C. nor D.P. is bonded with Mother. (*Id.* at 84-85). J.C. in particular seemed "very detached" in Mother's presence. (*Id.* at 85). J.C. also has emotional, behavioral, and mental-health issues that are being dealt with in a residential treatment facility. (Tr. Vol. II at 56). MCCS anticipates J.C. being returned to foster care with a longer-term goal of adoption. (*Id.* at 58). The record contains evidence that both children are adoptable. (*Id.* at 58, 60).

{¶ 18}  The record also reflects that D.P. has been in the temporary custody of MCCS for twelve or more months of a consecutive twenty-two-month period, which is a relevant best-interest factor. As for J.C., she had been in the temporary custody of MCCS since January 2011. Before that, she had been in the temporary custody of a relative.  The children's need for a legally secure placement is a best-interest factor militating in favor of permanent custody. The record demonstrates that a legally secure placement cannot be achieved without a grant of permanent custody to MCCS. Mother has not completed her case plan and does not appear close to being able to regain custody. D.P.'s foster parents are qualified to adopt him and are waiting to do so. J.C. is making progress in a residential facility and will be adoptable after her release.

{¶ 19}   The trial court also found that there are no relatives or others willing to accept legal custody of the children. Although Mother disputes this conclusion, the record contains evidence to support it. During the hearing, various potential legal custodians were discussed. An MCCS representative explained why none of them were viable candidates. (Tr. Vol. II at 61-69). On appeal, Mother argues that J.C. could have been placed with a person named T.V. and that D.P. could have been placed with a couple, A.M. and D.M. MCCS reasonably found T.V. unsuitable, however, given her own recent history with a children-services agency and the fact that she recently had been reunified with her own children. (*Id*. at 62). As for A.M. and D.M., the record contains evidence that they reported no longer being interested. (*Id*. at 66, 77). Unlike D.P.'s long-term foster parents, A.M. and D.M. also had never even seen D.P. and did not participate in the hearing. (*Id*. at 72, 113, 115). Having reviewed the record, we cannot say that the trial court erred in finding, by clear and convincing evidence, that an award of permanent custody to MCCS was in the children's best interest.

{¶ 20}   In arguing to the contrary, Mother repeatedly suggests that the agency was required to seek a planned permanent living arrangement in lieu of permanent custody. We disagree. "A planned permanent living arrangement, formerly called long-term foster care, 'is an alternative form of custody in which the child is placed in a foster home or institution, with the intention that the child will remain in that home or institution until he is no longer in the county child services system.'" *Miller v. Greene Cty. Children Serv. Bd.*, 162 Ohio App.3d 416, 2005-Ohio-4035, 833 N.E.2d 805, ¶20 (2d Dist.), quoting *In re D.B.*, 8th Dist. Cuyahoga No. 81421, 2003-Ohio-3521, ¶6. "'A PPLA does not sever the parental bonds as permanent custody does, but it also does not provide the child with a legally permanent placement.'" *Id.,* quoting *In*

*re D.B.* at ¶6. The Ohio Supreme Court has characterized a planned permanent living arrangement as a "last resort." *In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359, 852 N.E.2d 1187, ¶36. Such an arrangement lacks the permanency and stability that foster children need. *Id.* at ¶34-36. Before seeking a planned permanent living arrangement, a children-services agency must demonstrate that it has tried or considered all other possible dispositions. *Id.* at ¶36.

**{¶ 21}** Here MCCS chose to pursue another possible disposition—permanent custody—and it was not prohibited from doing so. Notably, in *In re A.B.*, the Ohio Supreme Court reversed the placement of a child in a planned permanent living arrangement where the children-services agency did not request that disposition and instead sought permanent custody. *Id.* at ¶37; *see also In re D.J.*, 12th Dist. Butler No. CA2008-06-142, 2008-Ohio-5424, ¶12 (finding that a children-services agency "had no obligation" to request a planned permanent living arrangement instead of permanent custody). Mother's second and third assignments of error are overruled.

**{¶ 22}** The judgment of the Montgomery County Common Pleas Court, Juvenile Division, is affirmed.

. . . . . . . . . . . . .

FAIN, P.J., and DONOVAN, J., concur.


Copies mailed to:

Mathias H. Heck
Matthew T. Crawford
Dawn S. Garrett
Hon. Nick Kuntz